UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:14-CR-078 JD |
| | ) | |
| MARY RAY | ) | |

## OPINION AND ORDER

This matter is before the Court on the defendant Mary Ray's objections to the Presentence Report. Ms. Ray was indicted on two counts of theft of government monies and two counts of filing false tax statements, each arising out of her embezzlement from LaPorte County, in addition to seven counts of wire fraud relative to a scheme to defraud her father-in-law, Norman Ray. A jury found Ms. Ray guilty on all counts. The probation officer then completed the Presentence Report, to which Ms. Ray has filed numerous objections. The Court therefore bifurcated the sentencing hearing and heard evidence and argument on each of the objections to the Presentence Report on December 22, 2015. The Court now resolves those objections, first addressing the objections that impact the calculation of the Sentencing Guidelines, and then addressing objections that go to the factors under 18 U.S.C. § 3553(a).[1]

**A. Guidelines Objections**

The Presentence Report arrives at a sentencing range of 97 to 121 months of imprisonment based on Ms. Ray's total offense level of 30 and her criminal history category of I. The Presentence Report first groups the eleven counts into a single group pursuant to § 3D1.2(d), and uses a base offense level of 7 pursuant to § 2B1.1(a)(1). It then adds the following enhancements: 14 levels under § 2B1.1(b)(1)(H) for a total loss amount of more than $550,000;

---

[1] The portions of the Presentence Report that are not addressed in this Order have not been objected to, so the Court adopts each of those paragraphs as undisputed.

2 levels under § 2B1.1(b)(10)(C) because the offense involved sophisticated means; 2 levels under § 3A1.1(b)(1) because the victim of the wire fraud offense was a vulnerable victim; 2 levels under § 3B1.3 because Ms. Ray abused positions of public and private trust; and 3 levels under § 3C1.3 for committing four of the wire fraud offenses while on pretrial release. Ms. Ray has objected to each of those enhancements except for the 2 levels under § 3B1.3 for abusing positions of public and private trust, and the Court addresses each objection in turn.

1. **Loss Amount**

The Presentence Report found a total loss amount of $805,851.71, composed of the following amounts: $153,002.46 in thefts from LaPorte County accounted for in the audit by the Board of Accounts; $3,272.15 stolen from a bank bag from LaPorte County on December 28, 2012; $43,772.40 in tax loss; and $605,804.70 in losses to Norman Ray through the wire fraud scheme. Ms. Ray raised various objections to these amounts, primarily arguing that she was not responsible for certain of the thefts from LaPorte County, and that the wire fraud loss amount may have improperly included amounts spent for the benefit of Norman Ray. The government responded to those objections with summary exhibits attached to its sentencing memorandum and through the testimony of Special Agent Matthew Maldia at the sentencing hearing. Based on that evidence, Ms. Ray withdrew her objections and conceded that the loss amount calculations in the Presentence Report were accurate, both for Guidelines and restitution purposes.

The Court agrees, with some minor modifications. First, the Court finds that the loss amount from LaPorte County is $156,274.61,[2] which includes the $153,002.46 reflected in the Board of Accounts audit and the $3,272.15 stolen from the bank bag in December 2012. Ms. Ray

---

[2] This is slightly different from the amount of $156,330.00 stated in certain paragraphs of the Presentence Report, the basis for which is unclear. The government filed a supplement in which it concurs with this slightly lower loss amount.

had objected that she was out of town on the dates of three of the entries in the Board of Accounts audit and thus could not be responsible for those loss amounts, and also that the evidence was insufficient to hold her accountable for the theft of the bank bag. However, as noted by the government, the dates listed in the Board of Accounts audit were the dates the respective deposits were made, not the dates any cash was removed from the deposits, so Ms. Ray's absence from the office on certain dates would not absolve her of responsibility for those amounts. In addition, the evidence at trial as to the thefts from the deposits and the theft from the bank bag, though circumstantial, was overwhelming, and established by much more than a preponderance of the evidence that Ms. Ray was responsible for each of those losses. Therefore, the Court finds that the loss amount and restitution due to LaPorte County is $156,274.61.

Second, the Court finds that the tax loss is $41,933. The Presentence report identified that amount as the amount of restitution due to the IRS, but also listed a slightly higher amount as the loss amount for Guidelines purposes. In response to an inquiry from the Court, the government has clarified that $41,933 represents the actual tax loss as calculated by a special agent, while the slightly higher amount was based on a percentage of the underreported income.[3] Because the actual tax loss is to be used when available, § 2T1.1(c)(1)(A), the Court finds that the loss amount to the IRS is $41,933 for both Guidelines and restitution purposes.

Finally, the Court finds that the loss amount from the wire fraud scheme is $603,108.05. The government's exhibits and Special Agent Maldia's testimony established that Ms. Ray converted $605,804.70 of funds originally belonging to Norman Ray to her own use. As the evidence at trial showed, Ms. Ray first arranged for Norman Ray's funds to be placed into

---

[3] Pursuant to § 2T1.1(c)(1)(A), the Presentence Report multiplied the underreported income by 28 percent. However, it based that calculation on an amount of $156,330 in underreported income from LaPorte County, which the Court has modified, as noted in the previous footnote.

accounts in Norman Ray's name, on which she was a joint account-holder. She then diverted funds from those accounts to her own exclusive control through various means, including cash withdrawals, checks written to herself or her husband, account transfers to her own accounts, and debt payments made to her accounts. The government's loss amount calculation encompasses the amounts involved in that last step, meaning the amounts removed from the jointly held accounts and directed to Ms. Ray or her husband. Ms. Ray did not take issue with the accounting of those amounts, but argued that this loss amount calculation failed to account for and subtract amounts that she spent for the benefit of Norman Ray. However, the evidence the government produced in response showed that with only a single exception, all of the payments made for the benefit of Norman Ray[4] were made from the joint accounts, which were not included in the loss amount calculation. [DE 102-1, -2]. In light of that evidence, Ms. Ray withdrew her objection as to the wire fraud loss amounts. The Court agrees that the government's loss amount calculation does not include amounts spent for the benefit of Norman Ray, with the sole exception of the first check written to Oak Woods Manor, in the amount of $2,696.65. [DE 102-1 p. 2]. The government conceded that that check was written from an account owned only by Ms. Ray and her husband, and it offered no reason why that payment should not offset the loss amount. Accordingly, the Court subtracts that payment of $2,969.65 from the government's loss amount calculation of $605,804.70, producing a total loss amount to Norman Ray of $603,108.05.

Therefore, the Court finds that the loss amounts for Ms. Ray's offenses include $156,274.61 in losses to LaPorte County, $41,933 in losses to the IRS, and $603,108.05 in losses to Norman Ray. The Court will order restitution accordingly. In addition, the total loss amount is

---

[4] Those primarily consisted of monthly payments to Norman Ray's assisted living facility, in addition to insurance, utilities, and other miscellaneous expenses. [DE 102-2].

$801,315.66, which is greater than $550,000 but less than $1,500,000, so the Court finds that the Presentence Report properly added 14 levels under § 2B1.1(b)(1)(H) for loss amount. Accordingly, the Court adopts paragraphs 6, 9, 19, 26, 34, 35, 37, 38, 44, and 85 of the Presentence Report, subject to the modifications described in this section.

Finally, the Court notes that the government contended in the Presentence Report that Ms. Ray also stole an additional bank bag from LaPorte County in August 2011. [DE 97 ¶ 11]. However, the Presentence Report did not include that amount in its loss amount calculation, and the government did not object. In addition, no evidence of that theft was introduced at trial, and while the few details the government submitted in the Presentence Report are not inconsistent with Ms. Ray having committed that theft, the Court cannot conclude on the basis of those limited details that there was actually a theft and that Ms. Ray committed it. Therefore, the Court does not adopt paragraph 11 of the Presentence Report.

### 2. Sophisticated Means

Ms. Ray next objects to the Presentence Report's addition of 2 levels for using sophisticated means in committing and concealing the thefts from LaPorte County. Section 2B1.1(b)(10)(C) calls for a 2-level enhancement if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." Application note 9(B) to that guideline defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." As the Seventh Circuit noted in *Ghaddar*, some degree of concealment may be inherent in these sorts of crimes, and "situations where a shopowner simply empties the cash register and hides the day's receipts under his bed 'must be distinguished from efforts over and above that concealment to prevent detection.'" *United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) (quoting *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir.

2001)). Thus, a sophisticated means enhancement "is warranted only 'when the conduct shows a greater level of planning or concealment than a typical fraud of its kind.'" *Id.* The question is not whether any of the defendant's actions in particular were intricate or sophisticated, though, but whether the defendant's "actions when viewed as a whole constituted a sophisticated scheme." *Id.*; *United States v. Wayland*, 549 F.3d 526, 529 (7th Cir. 2008) ("Even if [the defendant's] individual actions could be characterized as unsophisticated, . . . his overall scheme, which lasted nine years and involved a series of coordinated fraudulent transactions, was complex and sophisticated.").

    Here, the Court finds that Ms. Ray's offense involved sophisticated means, in that her conduct as a whole showed a greater level of concealment than is typical. Ms. Ray's concealment of her offense involved various means of manipulating the county's accounting software and circumventing the county's internal controls so as to avoid detection for a considerable period of time. In some instances Ms. Ray would merely fail to write a quietus for a check, and would take an equivalent amount of cash out of the deposit. She also sometimes inserted one check but removed another, pocketing the difference from the cash deposits. Other of her methods involved greater sophistication, though, such as when she would draft and print a quietus so that the depositing department's records appeared as if the deposit was properly accounted for, but she would then indicate to the software that the quietus had not printed properly, which caused the software to void that quietus, allowing her to take an equivalent amount of cash. She also used various means of redirecting deposited funds so that they would end up in the proper accounts after she had falsified the quietuses in order to deposit them. In addition, at Ms. Ray's suggestion, the Treasurer's office agreed to have Ms. Ray consolidate

each day's deposits and receipts, which prevented the Treasurer's office from being able to reconcile the amounts of the checks and cash against the quietuses.

Though not all of those means are particularly complex in isolation, when used in combination they amounted to an unusually complex level of concealment. This conduct led departments attempting to keep track of their deposits to believe that their funds had been properly documented and deposited. Ultimately, these efforts allowed Ms. Ray to escape detection for well over a year, and might have allowed her offense to go undetected entirely if not for her theft of a bank bag that began an investigation by the Board of Accounts. And even once the thefts were detected, auditors had to conduct a detailed and protracted analysis of records from the Auditor's office, the Treasurer's office, each of the various departments, and the bank, in order to determine what had been taken and how. Therefore, the Court finds that the 2-level enhancement for using sophisticated means is warranted, so the Court overrules Ms. Ray's objections and adopts paragraphs 27 and 45 of the Presentence Report.

### 3. Vulnerable Victim

Ms. Ray next objects to the vulnerable-victim enhancement under § 3A1.1(b)(1), which the Presentence Report applied based on Norman Ray's status as the victim of the wire fraud offenses. Section 3A1.1(b)(1) increases a defendant's offense level by 2 levels if the defendant knew that the victim of an offense was a vulnerable victim. A vulnerable victim is "a person (A) who is a victim of the offense of conviction . . . ; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2.

The Court finds that Norman Ray qualifies as a vulnerable victim. First, Norman Ray was eighty-four years old when the offense began, which can alone justify this enhancement in certain circumstances. *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003) ("[N]o other

factor need accompany age so long as the victim's vulnerability is related to the victim's age. Elderly victims satisfy the requirements of § 3A1.1(b)(1), especially when their financial investments and financial security are at issue." (internal citations omitted)). Likewise, even though Norman Ray is still alert and oriented, his statements to investigators and his testimony at trial revealed a decline in his memory, perhaps attributable to his age. For example, he could not recall the names of the banks he held accounts at, which would impair his ability to monitor his finances and detect any wrongdoing. Moreover, Norman Ray is physically disabled, as he suffered injuries to his leg and hip that cause him difficulty in moving around, leaving him less capable of managing his affairs on his own.

Furthermore, shortly after the offense began, Norman Ray's wife passed away and he also moved from his long-time home in St. Petersburg, Florida, to an assisted living facility in LaPorte, Indiana. *See United States v. Schlueter*, 634 F.3d 965, 968 (7th Cir. 2011) ("A two-level adjustment under U.S.S.G. § 3A1.1(b)(1) for targeting vulnerable victims would have been appropriate here because Schlueter scammed a recent widow and an elderly, retired couple."); *United States v. Parolin*, 239 F.3d 922, 927 (7th Cir. 2001) (finding that the victim "was particularly susceptible to Parolin's fraudulent schemes both because of her emotional state after her husband's death and her lack of financial sophistication."). That move also distanced Norman Ray from his other son, who also lives in Florida. This combination of factors caused Norman Ray to be isolated and dependent on at least some assistance, and reduced his ability to avoid, detect, or recover from the sort of crime committed against him. In fact, it appears that Norman Ray relied on Ms. Ray and her husband to a substantial extent, not only in managing his finances, but also with respect to his mobility and for companionship, and that reliance facilitated Ms. Ray's ability to commit the offense. The Court thus has little difficulty finding under these

circumstances that Norman Ray was unusually vulnerable. Moreover, given their relationship, there is no dispute that Ms. Ray was aware of these vulnerabilities, so the criteria for this enhancement are satisfied. Accordingly, the Court overrules this objection and adopts paragraphs 28 and 46 of the Presentence Report.

    **4.    Commission of an Offense on Pretrial Release**

Ms. Ray also objects to the addition of a 3-level enhancement under § 3C1.3 for committing an offense while on release. Ms. Ray was first indicted on September 10, 2014. She had her initial appearance and arraignment on those charges on September 12, 2014, after which she was released on bond. [DE 6]. The grand jury subsequently returned a superseding indictment, which added the seven wire-fraud charges. The last four of those counts were alleged to have occurred on September 13, 2014, October 13, 2014, November 1, 2014, and November 22, 2014, respectively, each of which were after Ms. Ray's release on bond. The government thus argues that this enhancement is proper. In her objection, Ms. Ray does not dispute that the transactions took place on those dates or that she was on pretrial release at those times, but solely argues that only a small percentage of the money was taken after her release, and that the money was taken out of accounts on which she was a joint account-holder and thus an owner of the funds.[5] Those arguments are immaterial, though, as it is undisputed that the charged wire transactions occurred while Ms. Ray was on release, and the jury's guilty verdict necessarily means that those transactions were in furtherance of the scheme to defraud, so each of those

---

[5] To the extent counsel is arguing that these transfers did not constitute offenses because they were taken from joint accounts, that argument is foreclosed by the guilty verdicts. Counsel also argued at the sentencing hearing that an enhancement for obstruction of justice requires specific intent, citing *United States v. Ewing*, 129 F.3d 430 (7th Cir. 1997). However, neither the Presentence Report nor the government proposes an enhancement for obstruction of justice under § 3C1.1, the Guideline to which that requirement applies—only the enhancement under § 3C1.3 for committing an offense on release is at issue.

separately-chargeable offenses were committed while Ms. Ray was on release. In addition, the argument that Ms. Ray made those transfers from accounts she owned overlooks the government's theory, which the jury presumably accepted, that the creation of the joint accounts and the placement of Norman Ray's funds into those accounts was part of Ms. Ray's fraudulent scheme. Defense counsel seemingly acknowledged the same during the hearing. Accordingly, because it is undisputed that Ms. Ray was on pre-trial release at the time of the wire transactions charged in Counts 8 through 11 of the superseding indictment, the Court finds that this enhancement is proper. The Court therefore overrules this objection and adopts paragraphs 30, 39, and 48.

### 5. Summary

To summarize the Guidelines calculation that results from the above rulings, Ms. Ray has a base offense level of 7 pursuant to § 2B1.1(a)(1). Her offense level is then increased by 14 levels for a loss amount of more than $550,000, pursuant to § 2B1.1(b)(1)(H); by 2 levels for sophisticated means, pursuant to § 2B1.1(b)(1)(C); by 2 levels for a vulnerable victim, pursuant to § 3A1.1(b)(1); by 2 levels for abuse of a position of trust, pursuant to § 3B1.3; and by 3 levels for committing an offense while on pre-trial release, pursuant to § 3C1.3. That results in a total offense level of 30. With Ms. Ray's criminal history category of I, the advisory sentencing range is 97 to 121 months of imprisonment, in Zone D of the Guidelines' sentencing table. Because this calculation is consistent with the calculation set forth in the Presentence Report, the Court also adopts paragraphs 49, 52, 74, and 83.

### B.     § 3553(a) Objections

Ms. Ray also objected to various factual assertions in the Presentence Report that do not affect the Guidelines calculation, but that may impact the § 3553(a) factors, so the Court addresses each in turn.

First, Ms. Ray objects to paragraph 7, which states that Ms. Ray "offered" to aggregate all of the deposits and receipts before bringing them to the Treasurer's office. Ms. Ray wishes to clarify that this offer came in response to an inquiry from the Treasurer's office as to suggestions to lighten its workload. The objection does not contradict, but merely seeks to supplement, the information in this paragraph, so the Court adopts paragraph 7 of the Presentence Report with this modification.

Second, Ms. Ray objects to paragraph 13, which asserts that Ms. Ray appears to have lied to the police regarding the cause of her bankruptcy (to avoid providing a motive for the thefts), which she claimed was because of loans that she cosigned with her father that she was unable to pay after he passed away. In support of this assertion, the Presentence Report indicates that the bankruptcy trustee did not note any debts of that type in the records or recall any such debts as part of Ms. Ray's bankruptcy. In her objection, Ms. Ray argues that debts can sometimes be left out of bankruptcy filings, so the fact that her filings do not include these debts does not show that she lied about them. However, the Court finds it implausible that if those debts were actually the cause of Ms. Ray's bankruptcy, as she stated to the police, she would have omitted them from her filings. Further, Ms. Ray has not identified any debts of this type that were actually omitted from her bankruptcy filings, so there is no basis on which to conclude that her statement was truthful. Therefore, the Court overrules this objection and adopts paragraph 13 of the Presentence Report.

Ms. Ray next objects to paragraphs 16 and 17, insofar as they characterize her as a "cosignatory" on Norman Ray's accounts instead of as a joint account-holder. The evidence at trial showed, and the government agrees, that Ms. Ray was a joint account-holder on those accounts, but the government argues that the term "cosignatory" is still accurate. That may be,

11

but for clarity, the Court will modify paragraphs 16 and 17 to note that Ms. Ray was also a joint account-holder on the accounts she opened with Norman Ray as part of her scheme to defraud.

Next, Ms. Ray objects to paragraphs 24 and 25, in which the government asserted that Ms. Ray had committed thefts during her employment with Indiana Abstract, where she worked for many years prior to her employment with LaPorte County. Those paragraphs offer little information from which to find that any thefts actually occurred, though, much less that Ms. Ray committed them. They note only that "upon reflection," the former owner of the company "recognized that it appeared that [Ms. Ray] had been stealing from both the company accounts and his own accounts." [DE 97 ¶ 25]. Without any factual basis to find that Ms. Ray committed this alleged misconduct, the Court sustains Ms. Ray's objection and will not adopt paragraphs 24 or 25.

Finally, Ms. Ray objects to paragraph 90, in which the probation officer identifies facts that might be considered aggravating. Ms. Ray particularly objects that this paragraph cites as an aggravating factor that she caused a dying woman to spend the last days of her life providing a video-taped deposition. The Court interprets this paragraph as only offering the opinion of the probation officer as to what factors may be aggravating, so the Court adopts paragraph 90 to that limited extent. The parties may argue at the sentencing hearing whether and to what extent any facts are actually aggravating or mitigating, and the Court will make its own assessment of those factors as part of its § 3553(a) analysis.

## C. Conclusion

The Court adopts paragraphs 1–10, 12–23, and 26–91 of the Presentence Report, subject to certain modifications and limitations as noted in this Order. The Court finds that Ms. Ray's total offense level under the Guidelines is 30, which, along with her criminal history category of I, produces an advisory sentencing range of 97 to 121 months of imprisonment.

SO ORDERED.

ENTERED: February 11, 2016

                                              /s/ JON E. DEGUILIO
                                       Judge
                                       United States District Court